# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| SATARIA BAKER, | ) | **Civil Action No: 3:24-cv-903** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL COMPLAINT AND |
| | ) | JURY DEMAND |
| MECKLENBURG COUNTY ABC BOARD, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

NOW COMES the Plaintiff Sataria Baker ("Baker"), by and through her undersigned attorney with HKM Employment Attorneys, LLP, files this Civil Complaint and Jury Demand ("Complaint") against Defendant, Mecklenburg County ABC Board ("the Board") and in support, sets forth the following allegations and causes of action:

## <u>NATURE OF THE ACTION</u>

1.       This is a discrimination civil action by Plaintiff Baker against the Board, arising from the Board's termination of Baker from her Store Manager position. This civil rights lawsuit aims to correct unlawful discrimination based on

sex, race, and disability; and retaliation for engaging in protected activity, and/or opposing race discrimination in the workplace.

2.    Sex discrimination is made unlawful by Title VII, 42 U.S.C. § 2000e-1, *et seq.* Discrimination based on childbirth and lactation are forms of prohibited sex discrimination under the Pregnancy Discrimination Act.

3.    Discrimination based on race is made unlawful under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C. § 2000e *et seq.*

4.    This lawsuit also asserts employment discrimination claims against the Board arising from the Family and Medical Leave Act, 29 U.S.C. §2615(a)(2) ("FMLA") and the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. §§ 12112(a), 12203(a).

5.    Plaintiff alleges that the Board discriminated against her based on her disability in the form of a mental health impairment. Baker also contends that the Board retaliated against her under the FMLA for taking intermittent medical leave for her disability and for filing multiples complaints alleging pregnancy, race, and disability discrimination. Baker seeks economic damages, including back pay and lost benefits; noneconomic compensatory damages; punitive damages to the extent applicable; liquidated damages under the FMLA; as well as her attorneys' fees and costs of litigation.

6.     This action seeks relief pursuant to 42 U.S.C. § 2000e-3(a), as amended, which prohibits retaliation against an employee for engaging in protected activity and this being an action for discrimination in violation of North Carolina public policy, namely N.C.G.S. §§ 143-422.2, and providing for relief against discrimination in employment pursuant to North Carolina Equal Employment Practices Act of 1977.

## THE PARTIES

7.     Ms. Baker is a resident of Gaston County, North Carolina. During the time of the events alleged in this complaint, she was employed as a Store Manager with the Board's ABC stores located in Mecklenburg County.

8.     ABC Boards in North Carolina are local, independent political subdivisions of the State. The purpose for which it exists is to regulate the flow of alcoholic beverages throughout the state and license those individuals who wish to sell the product.

9.     The Board is a covered entity in that it has had more than 15 employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. 42 U.S.C. § 12111(5)(A).

10.     The Board is a covered employer under the FMLA in that it is engaged in an industry affecting commerce and has had more than 50 employees for each

working day in each of 20 or more calendar weeks in the current or preceding calendar year. 29 C.F.R. § 825.104(a).

## PERSONAL JURISDICTION

11.     Jurisdiction of this Court is invoked pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, which requires the federal district courts to use the rules for personal jurisdiction of the state where the district court is located.

12.     Jurisdiction of this Court is also invoked pursuant to N.C. Gen. Stat. § 1-75.4(a)(d), as the Board was engaged in substantial business activity within this state at the time service of process was made upon it, and pursuant to N.C. Gen. Stat. §1-75.4(d), as this action arises from a local act or omission causing injury to Baker's person or property.

13.     The Board is a government corporation operating in Mecklenburg County, North Carolina.

## SUBJECT-MATTER JURISDICTION AND VENUE

14.     Jurisdiction of this Court is invoked pursuant to 29 U.S.C. §2601, et. seq. and 28 U.S.C. §§ 1331 and 1343.

15.     Venue is proper in this district and division under 28 U.S.C. § 1391(b)(1)-(2), as the Board conducts business in this judicial district and division. Some or all of the alleged unlawful acts also occurred in this judicial district and division.

4

## **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

16.     Baker filed her charge of disability discrimination, race discrimination, pregnancy discrimination, and retaliation with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2024-03400 on July 11, 2024.

17.     Baker subsequently received a Right-to-Sue letter from the EEOC on July 16, 2024, a copy which is attached as Exhibit A.

18.     Baker timely files her claims.

19.     Baker has exhausted her administrative remedies by timely filing a second Charge against the Board with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 430-2024-00531 on September 25, 2024. Baker is waiting action of the Commissioner pursuant to 29 CFR § 1601.28 and the statutory time requirements provided therein. Plaintiff reserves the right to amend this Complaint and to seek additional recovery when permitted by law.

## **FACTUAL ALLEGATIONS**

20.     Sataria Baker is an African American woman and was employed with the Board from February 2022, until her termination on or around August 22, 2024,

21.     Baker was originally assigned to work at Store No. 8 located in Charlotte, North Carolina.

22.     In February of 2023, a customer came into the store and assaulted Baker by spitting in her face. Baker filed and emailed an incident report with vehicle tag information and photos to an officer connected with the Board.

23.     Baker believed her assault matter was not taken seriously because of her race and later filed a complaint stating such.

24.     Baker took maternity leave in April/May of 2023 and returned to work in August 2023.

25.     In July of 2023, before Baker returned to work, Baker was breast feeding her baby and made an accommodation take breaks as needed for lactation pumping when she returned.

26.     In response to Baker's request for an accommodation, the Director of Human Resources ("HR") indicated it would comply with Plaintiff's right to pump.

27.     In August of 2023, Baker returned to work at Store No. 5 because she was unilaterally moved from Store No. 8 to Store No. 5.

28.     In addition to being unilaterally moved to a different store, the Board failed to provide a private space for lactation accommodation and Baker had to use her personal vehicle for lactation pumping.

29.     On August 21, 2023, Baker saw the same customer who spit on her at Store No. 8. Baker told Officer Bam what happened to her at Store No. 8 and she refused service to the customer.

6

30.     In September of 2023, Baker filed a complaint against a cashier for making inappropriate comments and exhibiting poor treatment. Adequate remedial action was not taken.

31.     In October of 2023, Baker objected to the District Manager changing her hours because working later hours adversely affected her baby's milk schedule. In response to Baker's objection, the District Manager stated, "I am not in the business of accommodating your personal life."

32.     In October of 2023, having received no accommodation long after she requested an appropriate pumping space, Baker again requested accommodations for a private room for lactation.

33.     In November of 2023, Baker was instructed to use an office that was monitored by a security camera in the office. Baker went back to pumping in her vehicle.

34.     Baker was treated with hostility and animosity when she needed to pump. For example, Baker was informed she would be placed on a performance improvement plan ("PIP") due to employee complaints that she was taking too many breaks for lactation pumping in order to feed her son.

35.     Due to the hostility and animosity Baker received at work and the stress from having to pump inside her vehicle, Baker had difficulties expressing breastmilk due to having no proper accommodation at work.

36.     Having received no private space for lactation accommodation over the course of four months, Baker submitted an inquiry with EEOC and was assigned No. 430-2024-00531 on November 9, 2023.

37.     In November of 2023, Baker contacted the US Department of Labor/ Wage & Hour Division ("DOL"), and she filed an internal grievance with the Board pertaining to unfair treatment in the workplace.

38.     In her internal grievance to the Board, Baker indicated actions were being taken against her in retaliation for taking lactation pumping breaks and because she asked for a designated lactation room.

39.     On November 27, 2023, an investigator from the DOL made an on-site visit. After the investigator's visit, the PIP requirement was removed.

40.     On November 28, 2023, although Baker would no longer be placed on a PIP, she was told to attend a 3-day catapult class. Nobody else was required to take this course.

41.     In December of 2023, the closet room was eventually cleaned out so Baker could utilize the space as a lactation room with privacy and no cameras.

42.     The closet room was provided long after Baker's request for an appropriate pumping space. Baker continued to experience difficulties expressing breastmilk due to the unreasonable delay in obtaining proper accommodation at work and she had trouble feeding her baby upon losing her milk supply.

43.     On January 3, 2024, Baker filed a second complaint against the same cashier and requested assistance in getting more support from leadership.

44.     Upon information and belief, no remedial action was taken to address Baker's complaints based, at least in part, because she had reached out to DOL.

45.     The hostile environment surrounding Baker's need to pump not only caused her to lose her milk supply, but it caused great anxiety. On January 9, 2024, Baker obtained FMLA leave information for her disability.

46.     On January 23, 2024, Baker emailed the Vice President of HR to clarify she was requesting FMLA for her own serious health condition and not because she needed time to bond with her child.

47.     In January 2024, Baker requested, and was granted, intermittent leave under the FMLA.

48.     Baker's FMLA leave in January 2024 was for serious health conditions, including but not limited to emotional health, mood disturbance, and chronic health.

49.     The expected frequency for the FMLA leave, as certified by Baker's treating medical provider, included the ability to take 2 days off per 8-to-12-hour shifts from January 17, 2024, to July 16, 2024.

50.     On January 26, 2024, Baker had a performance review where she received an overall score of 3.21.

51.     In late January of 2024, Baker completed the catapult class and received a certificate of completion.

52.     On February 28, 2024, Baker again saw the customer who previously spit on her. Baker did not see an officer in the store, but she sent a message to other ABC stores warning them of what the customer did and once again, she refused service to the customer.

53.     In February or March of 2024, Baker had a phone interview with an EEOC investigator regarding EEOC Inquiry No. 430-2024-00531. EEOC encouraged Baker to resolve her issue through her pending DOL claim and an EEOC charge was not filed on her behalf.

54.     On March 8, 2024, Baker received a Notice of Disciplinary Action because she refused service to the customer who previously assaulted and spit on her.

55.     On March 20, 2024, Baker had a meeting with HR where she strongly opposed the Notice of Disciplinary Action and wrote in her complaint, "…refusing a sale from a customer who assaulted me by spitting on my face while I was pregnant with my son…" and "….I am curious to know how this situation would have been handled if this happened to a Caucasian women."

56.     White individuals who requested assistance for similar circumstances received better treatment.

57.     Baker believed her race and prior complaints played a factor in how the Board handled the seriousness of the assault situation.

58.     Upon information and belief, the Board's disciplinary action taken against Baker was based, at least in part, upon the fact she engaged in protected activity. Again, when Baker refused service to the same customer on August 21, 2023, no disciplinary action was taken, but she was given a Notice of Disciplinary Action after she contacted DOL.

59.     White individuals who did the same or similar things for which Baker received a disciplinary action was not punished at all or were punished less severely.

60.     In March of 2024, Store No. 5 was assigned an interim Senior Store Manager. Upon information and belief, it was commonly known employees would call the prior Senior Store Manager, a Caucasian male, "Master".

61.     That upon information and belief, the Board's continued support of a hostile work environment for African American employees changed the conditions of Baker's employment.

62.     On April 1, 2024, the Board issued a 30-day ban to the customer who spit and assaulted Baker but upheld her Notice of Disciplinary Action for not making a sale to the same customer.

63. On April 16, 2024, Baker worked her regular shift but left early because she was not feeling well. She entered 3.17 hours of FMLA time into the system as she had previously done on multiple accusations without incident.

64. On April 22, 2024, the District Manager changed Baker's FMLA entry from April 16, 2024, to sick leave.

65. On April 23, 2024, Baker updated the pay code to accurately reflect she took time off for FMLA leave.

66. On April 26, 2024, Baker informed her District Manager she would be an hour late for work.

67. On April 29, 2024, the District Manager entered 2.73 hours of FMLA time for April 22, 2024, and 1 hour of FMLA time for April 26, 2024. Both entries effected Baker's pay period from April 20, 2024, to April 26, 2024.

68. On May 17, 2024, Baker received a Notice of Disciplinary Action because she updated the pay code to accurately reflect that she took time off for FMLA leave.

69. Upon information and belief, the Board's disciplinary action against Baker was based, at least in part, upon the fact she took intermittent leave under FMLA.

70. White individuals who did the same or similar things for which Baker received a disciplinary action was not punished at all or were punished less severely.

71.    After Baker's FMLA leave was approved, the HR Generalist made several negative and discouraging comments to Baker about utilizing her FMLA time.

72.    On June 18, 2024, Baker's FMLA intermittent leave for her disability was extended to January 16, 2025.

73.    On July 1, 2024, Baker reached back out to the DOL because her District Manager changed her pay code from FMLA leave to sick leave when she took FMLA qualified leave.

74.    On July 1, 2024, the Director of HR reached out to Baker to inform her that she had exhausted 8 weeks of intermittent leave, and her leave would expire on July 16, 2024. After Baker stated her FMLA intermittent leave was extended to January 16, 2025, she was told the Vice President of HR would reach out to her.

75.    On July 8, 2024, the Vice President of HR sent an email asking to check on Baker's FMLA time.

76.    On July 11, 2024, Baker filed EEOC Charge No.: 430-2024-03400 against the Board with the help of an EEOC investigator.

77.    On July 16, 2024, Baker received a Right-to-Sue letter from the EEOC.

78.    On July 25, 2024, the HR Generalist reached out to Baker while she was out on FMLA leave to inform her that she had exhausted 8 weeks of intermittent leave, and her leave would expire on July 16, 2024. Baker again corrected the

information by stating her leave was extended to January 16, 2025. The HR Generalist admitted she was not familiar with the rules surrounding FMLA before she abruptly terminated the call.

79.     On July 25, 2024, Baker sent an email stating in part, "I have only used 300.27 of the 320 hours available to me. I also have 60.85 hours of sick time and 167.01 hours of vacation time to exhaust. Understandably, I would have preferred to use my [time] away from work to focus on my mental and physical health. Instead, due to the discrimination and harassment, I've had to utilize my FMLA intermittent leave to draft this email and make yet another complaint about the ongoing harassment and discrimination."

80.     On July 25, 2024, Baker sent an email to the Director of HR regarding breach of confidentiality and asked that her healthcare information remain private as this information should only be shared with selected individuals who needed to know this private information.

81.     On July 26, 2024, Baker sent another email to the Director of HR stating, "…this is not the first time Brittany has shared information we have discussed in confidentiality to team members. Moving forward I hope this does not happen again." In response, the Director of HR told Baker going forward all correspondence concerning any requests from her would be followed up with a written response for her records as well as the Board's.

82.     On July 26, 2024, the interim Senior Store Manager changed Baker's FMLA hours to sick hours per the HR Generalist "due to being out of paid FMLA." However, Baker had 19.73 hours of her 320 hours of FMLA available on the date of her termination.

83.     On July 30, 2024, Baker sent an email stating, "As requested, attached are copies of my FMLA forms including the original form Anthany provided as well as the new updated form provided by you. If you need anything further to extend my FMLA, please let me know. As you know, I have filed grievances against Lindsay and Brittany regarding breach of confidentiality. For example, Lindsay informed cashier…I was on intermittent leave. I kindly request that my information only be shared with necessary parties…"

84.     On July 30, 2024, Baker sent an email to her District Manager to discuss the interim Senior Store Manager's tone and demeanor and to discuss the cash issues within the store. The interim Senior Store Manager apologized if she came across with a tone.

85.     On August 1, 2024, the Vice President of HR emailed Baker and stated, "…Sataria I will schedule time with you to discuss these documents as well as the other events that you stated in this email…we will discuss FMLA and sort through the FAQs and assumptions of protected rights under the Family Medical Leave Act."

86.     On August 5, 2024, the interim Senior Store Manager put out a "BOLO" for a black male in a white shirt under the subject "Snaggle snagged a Paul Mason VSOP." HR immediately responded and asked employees to state facts and informed staff it was not necessary to add "snaggle" or make unnecessary comments regarding appearance that could be used in court.

87.     On August 6, 2024, in response to HR's comments, Baker emailed her District Manager to address the interim Senior Store Manager's "BOLO" and stated, "After reading this email I want to share this. Last week Ashley shared with me her grandfather was a KKK. She also informed me how the black kids were afraid to come to her house and do homework with her because her grandfather was a known member of the KKK. She told me how the black kids would put their homework in a bottle and throw it in her yard. Name calling and disturbing conversations like this should not occur in the workplace. Hopefully, in the future this does not happen again and everyone is aware of offensive slurs, stories, and name calling in which is inappropriate in the workplace." The interim Senior Store Manager made her comments while at work. Baker stated, "As an African American who is listening to such conversation; this can be an uncomfortable situation to address in the moment, but it was important to share. Furthermore, the "BOLO's" comments regarding the black male's appearance were unnecessary."

88.     On August 9, 2024, Baker had her performance review which lasted approximately 1.5 hours. Baker received an overall rating of 3.13. During the review dissatisfaction from other staff members was never brought up to her attention.

89.     On August 13, 2024, HR had a meeting with Baker where she was mandated to attend an Employee Assistance Program (EAP) and that her employment was based on her willingness to sign a document confirming she would participate in the program.

90.     On August 13, 2024, Baker was abruptly suspended from work without pay.

91.     On August 21, 2024, Baker was again asked to sign a document confirming she would participate in the EAP program. On the form, Baker wrote, "Due to my disability I do not feel comfortable signing until I have someone of my personal choice look over this information. Thank you."

92.     On August 22, 2024, Baker received a notice of separation.

93.     On September 25, 2024, Baker filed a second EEOC charge against the board. EEOC assigned No. 430-2024-00531 to the second charge which is the same number EEOC assigned Baker's inquiry on November 9, 2023. Baker is waiting action of the Commissioner pursuant to 29 CFR § 1601.28.

///

///

## CAUSES OF ACTION

## COUNT I

### (Retaliation Based on Lactation)

94.     Plaintiff Baker incorporates by reference the above paragraphs as though set forth fully and separately herein.

95.     Discrimination because of an employee's childbirth-related lactation is unlawful under Title VII, 42 U.S.C. § 2000e-1 et seq. and the Pregnancy Discrimination Act subsumed within it.

96.     At all times material herein the Board was subject to the terms and conditions of the Fair Labor Standard Act of 1938, as amended, including 29 U.S.C. § 218D.

97.     On July 31, 2023, the Board's Director of Human Resources sent an email stating, "Sataria Baker is returning to work on tomorrow…she is currently breastfeeding and will need to take breaks as needed for lactation pumping…I know we have a policy about this, but I'm still researching for it," which indicates the Board was aware of Baker's request for accommodation.

98.     In November of 2023, Baker contacted DOL after the Board failed to provide reasonable accommodations for nursing mothers for over four months.

99. The Board threatened to place Baker on a PIP prior to her reaching out to DOL. The Board replaced the PIP with a requirement that Baker attend a 3-day catapult class instead. Nobody else was required to take this course.

100. Since DOL has closed its investigation, there has been a pattern of antagonism. For example, Baker was unfairly given Notice of Disciplinary Actions, she received lower performance scores, she endured negative comments towards utilizing her FMLA time, and she lacked managerial support with problematic staff members and customers who assaulted and spit on her while she was pregnant.

101. Prior to reaching out to DOL, Baker was meeting the Board's work expectations that she was aware of, and no one informed her of any expectations she was not meeting.

102. Firing Baker because she reached out to DOL, EEOC, and made internal complaints to the Board because she needed reasonable accommodations for lactation constitutes discrimination based on pregnancy or childbirth, which is unlawful under Title VII.

103. The Board recklessly, willfully, wantonly, and intentionally undertook this discriminatory act against Baker in violation of Title VII.

104. The Board's retaliatory conduct has inflicted various economic damages on Baker, including but not limited to loss of back pay, loss of front pay,

19

and loss of benefits, as well as noneconomic damages, including emotional distress and mental anguish.

## COUNT II

### (Retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. §2615(a)(2))

105.   Plaintiff Baker incorporates by reference the above paragraphs as though set forth fully and separately herein.

106.   Baker was an eligible employee under the FMLA who was qualified for her position.

107.   The Board is a covered employer under the FMLA.

108.   When Baker contacted the HR Generalist or the District Manager to inform them, she would need to take FMLA time, Baker was exercising her rights under the FMLA.

109.   Baker engaged in protected activity by requesting an accommodation to extend her FMLA intermittent leave to care for her serious mental health related disability from July 2024 through January 2025.

110.   The Board subjected Baker to an adverse action by terminating her employment within close temporal proximity of when she submitted her FMLA paperwork for extending her FMLA intermittent leave due to a serious mental health related condition.

111.   The Board discriminated and retaliated against Baker for exercising her rights under the FMLA in violation of 29 U.S.C. §2615(a)(2).

112.   As a direct and proximate cause of the Board's retaliatory conduct under the FMLA, Baker suffered damages, including, but not limited to: lost wages and benefits, lost past and future employment benefits, interest, costs and attorney fees.

113.   Given that the Board's actions reflect a willful violation of her FMLA rights, Baker is further entitled to liquidated damages.

## COUNT III

**(Violation of the Family and Medical Leave Act, 29 U.S.C. §§2601 *et seq.*-Interference)**

114.   Plaintiff Baker incorporates by reference the above paragraphs as though set forth fully and separately herein.

115.   Baker was entitled to FMLA intermittent leave to care for her serious mental health related disability.

116.   The Board's interference caused Baker harm. As a direct and proximate result of the Board's interference with Baker's FMLA rights, Baker has suffered damages as fully set forth in paragraphs 112 and 113 of this Complaint.

## COUNT IV

**(Disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a))**

21

117.   Plaintiff Baker incorporates by reference the above paragraphs as though set forth fully and separately herein.

118.   Baker was at all relevant times a qualified individual under the ADA in that during her employment with the Board, she had a mental health impairment, i.e., clinical depression and anxiety, that substantially limited her ability to conduct major life activities, including concentrating, thinking, and working.

119.   Baker could still perform the essential functions of her job with or without reasonable accommodations.

120.   The Board discriminated against Baker by terminating her based on her disability.

121.   The Board's discriminatory conduct under the ADA has inflicted various economic damages on Baker, including but not limited to loss of back pay, loss of front pay, and loss of benefits; as well as noneconomic damages, including emotional distress and mental anguish.

## **COUNT V**

**(Retaliation in violation of the Americans with Disabilities Act as Amended, 42 U.S.C. § 12203(a))**

122.   Plaintiff Baker incorporates by reference the above paragraphs as though set forth fully and separately herein.

123. Baker engaged in protected activity under the ADA in that she filed a complaint with DOL, EEOC, and/or an internal complaint with the Board alleging disability discrimination.

124. Baker engaged in protected activity when she applied to renew her FMLA intermittent leave for her own disability.

125. The Board retaliated against Baker by terminating her because of her protected activity under the ADA.

126. The Board's retaliatory conduct has inflicted various economic damages on Baker, including but not limited to loss of back pay, loss of front pay, and loss of benefits, as well as noneconomic damages, including emotional distress and mental anguish.

## **COUNT VI**

### **(42 U.S.C.A § 1981)**

127. Plaintiff Baker incorporates by reference the above paragraphs as though set forth fully and separately herein.

128. 42 U.S.C.A. § 1981 prohibits race discrimination in the making and enforcement of contracts, including employment contracts.

129. Baker is an African American woman and was employed with the Board.

130.   On March 20, 2024, Baker had a meeting with HR where she strongly opposed the Notice of Disciplinary Action and wrote in her complaint, "…I am curious to how this situation would have been handled if this happened to a Caucasian women."

131.   On August 6, 2024, Baker emailed her District Manager to address the interim Senior Store Manager's "BOLO" comments and story about her grandfather being a member of the KKK and how that made her uncomfortable as an African American.

132.   On August 22, 2024, Baker received a notice of separation.

133.   Baker's employment was terminated because of her race when she engaged in protected activity by filing an internal complaint with the Board and when she contacted EEOC.

134.   The Board subjected Baker to an adverse action by terminating her employment within close temporal proximity of when she engaged in protected activity by opposing practices made unlawful pursuant to 42. U.S.C. § 1981 as alleged herein.

135.   As a result of the Board's racially motivated conduct, Baker suffered lost wages and benefits, as well as noneconomic compensatory damages, including mental anguish and emotional distress.

## COUNT VII

## (42 U.S.C.A. § 2000e-2(m))

136.   Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

137.   On March 20, 2024, Baker had a meeting with HR where she strongly opposed the Notice of Disciplinary Action and wrote in her complaint, "…I am curious to how this situation would have been handled if this happened to a Caucasian women."

138.   On August 6, 2024, Baker emailed her District Manager to address the interim Senior Store Manager's "BOLO" comments and story about her grandfather being a member of the KKK and how that made her uncomfortable as an African American.

139.   The Board terminated Baker from her employment for reasons at least partly motivated by race, in violation of Title VII of the Civil Rights Act of 1964, as amended in 1991, 42 U.S.C.A. § 2000e-2(m).

140.   As a result of the Board's racially motivated conduct, Baker suffered lost wages and benefits, as well as noneconomic compensatory damages, including mental anguish and emotional distress.

## COUNT VIII

## (Wrongful Termination in Violation of Public Policy)

141.    Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

142.    It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination.

143.    The adverse employment actions taken by the Board including the refusal to continue to employ Baker was done for unlawful purposes in violation of the public policy of the State of North Carolina, specifically, the North Carolina Equal Practices Act, N.C.G.S. § 143-422.1 *et seq*, which makes discrimination on account of race, sex, or handicap by employers which regularly employ 15 or more employees an unlawful practice in North Carolina.

144.    The Board is an employer within the meaning of N.C.G.S. § 143-422.2, in that it regularly employs 15 or more employees.

145.    Baker was terminated because she engaged in protected activity.

146.    Baker was wrongfully terminated in violation of the Retaliatory Employment Discrimination Act, N.C.G.S. § 95-240 *et seq*.

147.    Baker suffered one or more adverse job consequences intentionally imposed by the Board, including: subjecting Baker to a catapult class, placing Baker on a Notice of Disciplinary Action, and terminating her employment. These

consequences are of the type that would tend to discourage similarly situated employees from reporting, opposing, or participating protected activity.

148. A causal connection exists between Plaintiff's protected activities and the Board's materially adverse actions because Baker reported, opposed, and participated in a DOL and EEOC investigation.

149. The Board's above-described conduct was intentional.

150. The Board's above-described conduct was done with malice and with reckless indifference to Baker's state and federally protected rights.

151. As a direct and proximate result of the Board's above-described actions, Baker has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages and attorney's fees and costs as permitted by law.

152. Baker was terminated because she reported, opposed, and participated in a DOL and EEOC investigation.

153. The Board is liable to the Plaintiff for wrongful termination in violation of Title VII of the Civil Right's Act of 1964, as amended, and North Carolina public policy, namely N.C.G.S. §143-422.2.

///

///

## PRAYER FOR RELIEF

**WHEREFORE**, based on the above stated claims, Plaintiff demands that the following relief be granted:

A. Back pay, front pay, and lost benefits, including liquidated damages under the FMLA;

B. Compensatory damages to the extend allowed by law;

C. Punitive damages for all claims as allowed by law;

D. Attorneys' fees and costs of litigation;

E. Prejudgment, and post-judgment interest at the highest lawful rate; and

F. Grant other equitable and monetary relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully submitted this 14th day of October, 2024.

*/s/Sunny Panyanouvong-Rubeck*
Sunny Panyanouvong-Rubeck
N.C. Bar No. 39966
spanyanouvong-rubeck@hkm.com

**HKM Employment Attorneys LLP**
3623 Latrobe Drive, Unit 122
Charlotte, NC 28211
(980) 734-3851

*Attorneys for Plaintiff Sataria Baker*

28